**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 2:16-cr-175 |
| | ) | |
| DOUGLAS TYRONE WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED OPINION**[*]

**Mark R. Hornak, Chief United States District Judge**

Millions of people live in the Western District of Pennsylvania, so the chances that a citizen called in for jury duty will have a connection to one of the lawyers trying the case are low. But it can happen. And in this case, it did. Roughly a month after a jury unanimously convicted Defendant Douglas Tyrone Williams, Jr. on all counts alleged in a Superseding Indictment, Special Assistant United States Attorney Chad Parks, one of two lawyers who prosecuted Williams, learned that one of the jurors spent seventeen (17) years in the foster care of Parks's great-grandmother's niece. Neither Parks nor the juror knew that when the Court conducted *voir dire* in Williams's case. But once it learned this information several weeks after the trial concluded, the United States promptly informed Williams and the Court.

Williams now moves for a new trial, claiming that the juror was biased against him or in favor of the United States based on the juror's attenuated connection to Parks. After holding an

---

[*] In conjunction with the litigation of these Motions, no party sought the transcription of any part of these proceedings. After the Court issued its Opinion in this case, counsel for the United States advised the Court and counsel for the Defendant of what it perceived to be one or more typographical errors in the original Opinion of this Court, and an inaccuracy in the identification of a law enforcement officer engaged in the apprehension of the Defendant at the time of his arrest. The Court therefore caused the transcription of certain portions of the *voir dire* process relevant here, and of the portion of the trial testimony relative to the Defendant's apprehension. This Amended Opinion is issued to more completely address such matters. Such matters are noted with asterisk footnotes at the appropriate portions of the Amended Opinion. Such amendments do not change the Court's disposition of the matters addressed by the Court, so the Court's Order at ECF No. 295 remains unchanged.

evidentiary hearing on the issue, the Court cannot agree with Williams's assessment. Williams received a jury fair both in appearance and in fact—exactly what the Sixth Amendment demands. Williams's Motion for a New Trial (ECF No. 259), therefore, is **DENIED**. And because the United States presented sufficient evidence, and then some, at Williams's trial to support a guilty verdict on all counts, Williams's separate Motion for Judgement of Acquittal (ECF No. 247), is similarly **DENIED**.

I.     **FACTS & PROCEDURAL HISTORY**

On August 12, 2019, a jury found Williams guilty on all counts alleged against him in a Superseding Indictment. Williams timely filed a Motion for Judgment of Acquittal under Federal Rule of Criminal Procedure 29. (ECF No. 247.) Then, on September 4, 2019, the United States filed a Notice on the docket apprising Williams and the Court of information that it learned following the jury's verdict. (Notice, ECF No. 252.) In its Notice, the United States disclosed that on August 29, 2019, Special Assistant United States Attorney ("SAUSA") Chad Parks—who acted as co-counsel for the United States during Williams's trial—"learned of an attenuated connection [he had] with one of the jurors" from Williams's trial. (*Id.*) Specifically, Parks learned that one (1) of the jurors "was, for a period of seventeen years, the foster child of Park's [sic] great-grandmother's niece." (*Id.*) The Notice advised that Parks was unaware of this connection and never interacted with the juror before the trial. The Notice also informed the Court that the juror spoke with Parks's father on August 29—seventeen (17) days after the jury returned its verdict— and that Parks's father, Larry Parks, "confirmed the attenuated connection and informed Parks." (*Id.*) Chad Parks then briefly spoke with the juror personally. The United States' Notice suggested that the juror may have realized a possible connection to Chad Parks during opening statements. The United States, in providing the Notice, stated that it did not believe any relief was warranted.

2

But the United States rightly recognized that it must disclose the new information to Williams and the Court.

Following the United States' Notice, the Court directed Williams to respond. Williams moved to hold an evidentiary hearing, or in the alternative, for a new trial. (Mot. for Hr'g, ECF No. 259.) The Court applied the two-part test set out in *United States v. Noel*, 905 F.3d 258 (3d Cir. 2018), and concluded that an evidentiary hearing was necessary. (Order, ECF No. 269; Amended Order, ECF No. 271.) The Court further ordered three (3) witnesses to appear at the hearing: (1) Juror 5; (2) SAUSA Chad Parks; and (3) Larry Parks. Because the Court later learned that Juror 5 was out of the District, and planned to remain so for some time, the Court split the hearing over two (2) days. SAUSA Chad Parks and Larry Parks testified in person on the first day. (Dec. 20, 2019 Evid. Hr'g Tr., ECF No. 291.) And a few weeks later, Juror 5 testified by live video from the Middle District of Florida where he resides in the winter, on the consent of Williams and the United States. (Jan. 10, 2020 Evid. Hr'g Tr., ECF No. 292.) Because the Court's decision on Williams's new trial motion hinges primarily on Juror 5's testimony, the Court will review that before doing the same as to SAUSA Parks and Larry Parks's testimony.

### A.  Juror 5's Testimony

Juror 5 testified via video, with the consent of all parties, from the United States Courthouse in Ocala, Florida in the Middle District of Florida. The video technology allowed the Court to both hear Juror 5's spoken answers to direct and cross examination, and just as importantly, to observe Juror 5's demeanor and body language throughout his testimony. Based on the Court's observations and consideration of Juror 5's testimony at the evidentiary hearing, both in substance and in consideration of his testimonial demeanor, the Court finds Juror 5 to be a wholly credible witness.

Juror 5 recalled appearing at the United States Courthouse in downtown Pittsburgh when called for jury duty. And he similarly recalled the *voir dire* process and being selected as a juror for Williams's trial. (ECF No. 292, at 8:20–9:3.)

During that testimony, Juror 5 confirmed he had an attenuated connection to SAUSA Parks. From the age of five (5) until he was eighteen (18), SAUSA Parks's great-grandmother's niece served as Juror 5's foster parent. (*Id.* at 22:8–17.) Juror 5 described his foster care experience with SAUSA Parks's relative as basically a normal childhood. (*Id.* at 19:22–25.) And he testified that during that foster care experience he occasionally saw SAUSA Parks's mother, who is roughly the same age as Juror 5. (*Id.* at 20:1–9.) Typically, these interactions of Juror 5 with SAUSA Parks's mother took place at birthday parties or other similar family get-togethers, though these were relatively infrequent. (*Id.*)

After he turned eighteen (18) and moved out of his foster home, Juror 5 testified that he occasionally interacted with SAUSA Parks's mother and father, Larry Parks, over the years roughly a half dozen times. (*Id.* at 22:18–23:7.) But Juror 5 testified that he and SAUSA Parks's parents fell out of touch following Juror 5's divorce from his first wife in the early 1980s. (*Id.*) In the past decade or so, Juror 5 testified that he only saw SAUSA Parks's parents in passing a couple of times. (*Id.* at 13:6–13.)

As for SAUSA Parks, Juror 5 testified that he had never seen or spoken to SAUSA Parks before appearing for jury duty in Williams's trial. (*Id.* at 10:21–11:22.) Juror 5 remembered, during the *voir dire* process, that the Court asked SAUSA Parks and his co-counsel to stand up and asked the jury pool whether anyone knew the prosecutors in the case. (*Id.* at 21:10–18.) And Juror 5 testified that he did not recognize either SAUSA Parks or the other prosecutor. (*Id.*) In addition, Juror 5 testified that he vaguely recalled the Court defining "immediate family," as the Court would

4

use the term during *voir dire*. (*Id.* at 21:19–22:1.) And he testified that there was nothing about SAUSA Parks that made him believe that he knew him. (*Id.* at 22:2–7.)

Juror 5 testified that when SAUSA Parks introduced himself, the name "Parks" rang a bell—particularly because SAUSA Parks mentioned growing up in Beaver County during his opening statement. (*Id.* at 11:17–22.) Yet Juror 5 said that he "didn't think anything of it," and "it never crossed [his] mind" that SAUSA Parks might be related to Juror 5's foster family. (*Id.* at 12:2–8.) SAUSA Parks referenced growing up on a dairy farm when he talked about his childhood in his opening statement. And as far as Juror 5 knew, Larry Parks did not own a dairy farm, so when SAUSA Parks referenced his background during opening statements, the dairy farm comment did not raise any red flag for Juror 5. (*Id.* at 16:11–25.)

It was not "until a month and a half or more after the trial when" Juror 5 made the connection between his foster family and SAUSA Parks. (*Id.* at 12:12–14.) That is when Juror 5 attended a fair in Beaver County and ran into Larry Parks. (*Id.* at 12:12–18.) Juror 5 last saw Larry Parks over a year earlier when he happened to run into Larry Parks at a local RV dealership and exchange brief pleasantries. (*Id.* at 13:10–13.) And it had been years since Juror 5 saw or spoke to SAUSA Parks's mother. (*Id.* at 13:14–16.) Because it had been so long since Larry Parks saw Juror 5, when he spotted Juror 5 at the fair, he extended an invitation to stop by his nearby home to catch up. (*Id.* at 14:12–16:4.)

Larry Parks, who was volunteering at the fair, stayed at the fairgrounds to help clean dishes for a few minutes after inviting Juror 5 to his home. (*Id.*) But Juror 5 headed straight there and met SAUSA Parks's mother on her front porch, where the two began to chat. A short time later, Larry Parks finished working at the fair and joined Juror 5 back on his front porch. (*Id.*) After speaking for a short while, Juror 5 became curious whether SAUSA Parks was related to Larry Parks. (*Id.*)

So Juror 5 asked "Larry, do you know a Chad Parks," to which Larry responded, "Yes. That's our son." (*Id.* at 17:4–24.) All this surprised Juror 5, who did not even know until then that Larry Parks had a son who was a lawyer, let alone the prosecutor in this case. (*Id.*)

This revelation prompted Larry Parks to call SAUSA Parks, while still on the porch with Juror 5. (*Id.* at 18:7–19:10.) SAUSA Parks answered the call, and Larry briefly handed his cell phone to Juror 5, so that Juror 5 could speak with SAUSA Parks. (*Id.*) Juror 5 testified that he told SAUSA Parks that he had not realized who SAUSA Parks's parents were during jury selection and Williams's trial. (*Id.*) Though their phone conversation was brief, Juror 5 testified that SAUSA Parks asked him why the jury had not returned a guilty verdict on all counts—since the jury did not answer "yes" to a special interrogatory related to alleged fentanyl possession. (*Id.*) Juror 5 answered that the jury did not think there was enough evidence to support the requested fentanyl finding. (*Id.*) That ended the conversation, and Juror 5 returned Larry Parks's phone. (*Id.*)

Juror 5 did not stay at Larry Parks's home much longer after the brief phone call with SAUSA Parks. In total, Juror 5 estimated that he spent roughly forty-five (45) minutes to an hour at Larry's home that evening. (*Id.* at 13:24.)

**B.  SAUSA Chad Parks's Testimony**

SAUSA Chad Parks testified during the first of the two (2) days when the Court held the evidentiary hearing. He recalled being one of the lead prosecutors in the United States' case against Williams. (ECF No. 291, at 15:19–16:11.) And, specifically, he recalled participating in jury selection for that trial. (*Id.* at 16:12–17:13.) SAUSA Parks testified that he was present for the entire jury selection process. (*Id.*) He also read through the list of potential jurors' names and addresses as the jury selection process unfolded, but did not recognize anyone—and though he noted that a few potential jurors lived in Beaver County, where he grew up, he did not recognize

their names. (*Id.* at 17:14–18:18:16.)

SAUSA Parks also testified about his brief phone call with Juror 5 a little over a month after the trial ended. (*Id.* at 20:4–23:6.) He recalled receiving a text message from his father, Larry Parks, that contained a picture of an individual sitting on what appeared to be SAUSA Parks's parents' front porch. (*Id.*) When he looked closer, SAUSA Parks recognized the individual on his parents' porch as a juror in Williams's trial. (*Id.*) This caused SAUSA Parks to immediately call his father and ask his father how he was connected to Juror 5. (*Id.*) Larry Parks then explained the relationship between Juror 5 and SAUSA Parks's mother's side of the family—that SAUSA Parks's great-grandmother's niece was Juror 5's foster parent for many years. (*Id.* at 23:13–24:13.) While SAUSA Parks learned that his parents knew Juror 5 from years ago, he testified that he had never met Juror 5, aside from during Williams's trial. (*Id.*)

## C. **Larry Parks's Testimony**

Because Larry Parks's text message to and phone call with SAUSA Parks led to the United States' filing the Notice about Juror 5, the Court felt it necessary to hear testimony from Larry Parks about his family's connections to the juror. Larry Parks testified, in person, the same day as SAUSA Parks. As explained below, Larry Parks's testimony differed from SAUSA Parks and Juror 5's testimony on some important moments. But based on the Court's consideration of the entire record in these regards, along with the Court's extensive personal observations of each of the witnesses, the Court attributes any difference occurring in Larry Parks's testimony simply to a lapse or imprecision in memory, not anything sinister. And on the big picture, the Parks family's connection to Juror 5, Larry Parks testified consistent with Juror 5 and SAUSA Parks.

Larry Parks confirmed that his wife's maternal grandmother's niece was Juror 5's foster mother. (*Id.* at 54:11–22.) Larry Parks testified that Juror 5 had met SAUSA Parks many years

earlier, when SAUSA Parks was "two or three years old."[1] (*Id.* at 53:20–54:7.) But Larry Parks testified, consistent with Juror 5, that Juror 5 interacted with SAUSA Parks's mother at occasional family events when both were children. (*Id.* at 54:1–18.) What's more, Larry Parks testified that, aside from the brief interaction that the RV repair store that Juror 5 testified about, he had not seen Juror 5 for many years before running into Juror 5 at the county fair. (*Id.* at 55:15–56:9.) While Larry Parks and his wife had been friendly with Juror 5 in their younger years, they had fallen out of touch in recent *decades.* All of this is more or less the same as Juror 5's testimony about his connection to the Parks family in all material respects.

Larry Parks's testimony was different more significantly regarding the interaction he had with Juror 5 at the county fair a little over a month after Williams's trial ended. But, again, the Court attributes any differences to the failure to remember an event that Larry Parks likely did not realize had any importance at the time it happened. Larry Parks testified that he invited Juror 5 over to see SAUSA Parks's mother when Larry ran into Juror 5 at the RV repair store. (*Id.* at 56:11–20.) And that Juror 5 said he would stop by when he attended the county fair. (*Id.*) But that interaction, according to Larry Parks, took place in Summer 2018, well over a year before Williams's trial. (*Id.* at 57:7.) And Larry Parks also testified that he did not expect or anticipate seeing Juror 5 at the 2019 county fair, which took place shortly after Williams's trial.

Broadly consistent with Juror 5's testimony, Larry Parks testified that he spotted Juror 5 in the food serving line at the county fair while Larry was volunteering there. (*Id.* at 57:24–58:25.) And consistent with Juror 5's testimony, Larry Parks told the Court that he invited Juror 5 back to his house and that Juror 5 headed to Larry's home before Larry finished volunteering at the fair.

---

[1] This testimony was different than Juror 5's, who said that he never saw SAUSA Parks before appearing for jury duty in Williams's trial. But the Court attributes this difference to either Juror 5 not remembering meeting an infant Chad Parks decades earlier, or Larry Parks thinking that Juror 5 met his son as an infant, when no such meeting ever occurred. Either way, the difference is immaterial.

(*Id.*) Thus, Juror 5 was already at Larry's house by the time Larry finished working at the fair. (*Id.*)

As for when SAUSA Parks first came up in conversation, Larry Parks testified that Juror 5 realized the connection before Larry returned from the fair. (*Id.* at 61:4–12.) But Juror 5 and Larry Parks's wife recounted the moment of realization to Larry once he returned. (*Id.*) And Larry Parks's testified that Juror 5 made it clear to both of the Parks while on the porch that he did not know SAUSA Parks was their son until talking with SAUSA Parks's mother on the porch on that very occasion, which was roughly a month after the trial ended. (*Id.*) When Larry Parks heard that Juror 5 served on Williams's jury, he texted SAUSA Parks. (*Id.* at 61:11–24.) Larry Parks, unlike SAUSA Parks, testified that he did not send a picture of Juror 5 on the porch along with the text message to SAUSA Parks. (*Id.* at 62:10–22.) And while Larry Parks remembered SAUSA Parks calling him shortly after the text message, he said that he never handed the phone to Juror 5 to speak with SAUSA Parks. (*Id.* at 62:23–63:12.)

In the Court's estimation, any incongruities in Larry Parks's testimony are harmless in the big picture. Nothing about Larry Parks's testimony was incredible or even hinted at deception. Rather, it appeared to the Court that Larry Parks was trying his hardest to tell the truth about events he may not have fully remembered or assigned any importance to at the time they happened. *Accord* Third Circuit Model Criminal Jury Instruction § 3.04.

## II.   <u>MOTION FOR NEW TRIAL (ECF NO. 259)</u>

Following the United States' Notice about Juror 5's attenuated connection to SAUSA Parks, Williams moved for a new trial on jury bias grounds. (ECF No. 259.) Because the credible testimony from Juror 5, SAUSA Parks, and Larry Parks at the post-verdict evidentiary hearing leaves the Court convinced that Williams received the impartial jury guaranteed to him by the Sixth Amendment, Williams's new trial motion is denied.

A survey of the case law identifies three (3) claims that a defendant can raise in situations like the one facing the Court. First is an implied bias claim, which arises in narrow circumstances when some characteristic about the juror requires that the Court impute bias as a matter of law. Second is an actual bias claim, which arises when the juror comes to court with some fixed set of beliefs or life experiences that prevents them from impartially deciding the case. Third is a *McDonough* claim, which essentially asks whether the juror was dishonest when answering a *voir dire* question and whether that juror would have been struck for cause had he answered honestly. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

The Third Circuit has not addressed how these three (3) claims interact with one another, as the formulation for each has a degree of overlap. Neither has the Third Circuit, as other Courts of Appeals have, expressly held that these are distinct claims. The Court's reading of the case law suggests that they are distinct claims, so the Court will examine each in turn. Because the Court's determination about Williams's implied and actual bias claims substantially informs the Court's *McDonough* claim analysis, the Court will address implied and actual bias before turning to *McDonough*. In the end, the Court concludes that Juror 5 held neither actual nor implied bias for the Untied States or against Williams, and that Juror 5 neither lied during *voir dire*, nor would have been struck for cause. As a result, Williams's Motion for a New Trial is denied.

### A.  <u>Implied Bias Claim</u>

Our Court of Appeals' decision in *United States v. Mitchell* provides the framework for consanguinity-based implied bias challenges. 690 F.3d 137 (3d Cir. 2012). In *Mitchell*, a member of the venire raised his hand when the district judge asked if anyone was related to the prosecutor in the case. *Id.* at 140. The potential juror explained that he was a cousin of the prosecutor, though he did not say whether the prosecutor was a first cousin or some more distant relationship. *Id.*

When asked by the judge, the potential juror affirmed that he could be impartial if selected. *Id.* Inexplicably, neither party asked the juror any follow-up questions, challenged the potential juror for cause, nor made a preemptory strike on the potential juror. *Id.* As a result, the prosecutor's "cousin" sat on the jury. *Id.* The jury found the defendant guilty, leading the defendant to claim that the juror was biased against him because of the juror's familial relationship to the prosecutor.

*Mitchell* required the Third Circuit to address what degree of consanguinity between a juror and a principal participant in the trial would require the court to presume bias on the part of the juror. Implied bias, the Third Circuit explained, is "bias conclusively presumed as [a] matter of law, or, put another way, bias attributable in law to the prospective juror regardless of actual partiality." *Id.* (alteration in original) (quoting *United States v. Wood*, 299 U.S. 123, 133 (1936)) (internal quotation marks omitted). Implied bias, then, requires a categorical approach. And any potential juror who falls into an implied bias category cannot sit as a juror in the case. *Id.* The Third Circuit cautioned that categories of individuals for who courts must imply bias should be narrowly drawn. *Id.* at 863–64.

Our Court of Appeals then surveyed the landscape of consanguinity implied bias law. On one end of the spectrum, the Third Circuit noted Chief Justice Marshall's opinion in *United States v. Burr*, 25 F. Cas. 49 (C.C.D. Va. 1807) (No. 14,692g) (Marshall, C.J., riding circuit). In *Burr*, the Chief Justice held that any degree of relationship between a juror and a principal participant in the case conclusively proved bias.[2] *Id.* at 50. On the other end of the spectrum was Justice O'Connor's concurrence in *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). There, Justice O'Connor suggested that only "close relatives" required a court to presume bias. *Id.* The Third Circuit adopted Justice O'Connor's narrower approach to implied bias. *Mitchell*, 690

---

[2] The Seventh Circuit adopted an approach much like Chief Justice Marshall's. *See United States v. Brazelton*, 557 F.3d 750, 753–54 (7th Cir. 2009).

F.3d at 146 ("These considerations lead us to agree with Justice O'Connor that the kinship category of implied bias excludes jurors who are 'close relative[s]' of a principal in a case." (alteration in original)). The Third Circuit reasoned that the presence of "distant relatives" on the jury would not "lodge serious doubts in the public's mind about the neutrality of the proceedings"—at least as a conclusive legal presumption. *Id.* at 147. So to strike a juror for cause based on implied bias because of consanguinity in our circuit, the juror must be a "close relative."

Here, Williams invokes *Mitchell* for the idea that the Third Circuit recognizes "the presumption of bias for relatives of trial participants serving on a jury under the Sixth Amendment." (ECF No. 259, at 2.) Yet *Mitchell*'s holding is much narrower than that general statement; only excluding "close relatives" as a matter of law. *See id.* at 146–47. While the Third Circuit did not articulate exactly what level of consanguinity is close enough to imply bias, this case is not a close call. The Court can confidently say that (1) the foster child of (2) the prosecutor's great-grandmother's (3) niece is not a "close relative." And allowing that (very) distant non-blood/non-marital relative to serve on a jury in a case brought by the prosecutor would not in and of itself lodge serious doubts in the public's mind about the neutrality of the proceedings as a conclusive legal presumption. As a result, Williams cannot show that Juror 5 held any implied bias against him or in favor of the United States based on *Mitchell*.

**B. <u>Actual Bias Claim</u>**

The Supreme Court has long identified bias as a state of mind—one that even the juror might not identify is present. *Smith*, 455 U.S. at 221–22; *Wood*, 299 U.S. at 133. Actual bias is what it sounds like: "bias in fact." *Mitchell*, 690 F.3d at 142. It is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)). The Court must excuse a juror who is actually

biased. *See, e.g.*, *Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *United States v. Skelton*, 893 F.2d 40, 45–46 (3d Cir. 1990); *United States v. Wooton*, 518 F.2d 943, 946 (3d Cir. 1975). Even if the juror's actual bias does not come to the court's attention until after the verdict, it is still grounds for granting a new trial. *See McDonough*, 464 U.S. at 556 (Blackmun, J., concurring).

The Third Circuit's decision in *Mitchell* provides an important instruction on the effect of a post-verdict evidentiary hearing into a juror's bias. There, the Third Circuit noted that "*Smith* held that a post-verdict hearing to probe a compromised juror for actual bias satisfies due process when there is no basis for finding implied bias." 690 F.3d at 147 (citing *Smith*, 455 U.S. at 217). Actual bias, then, requires an actual inquiry into the mind of the individual juror. As a result, the "[d]istrict courts possess broad discretion in excusing prospective jurors for cause on the basis of actual bias." *Id.* A "juror is found by the judge to be partial either because the juror admits partiality . . . or the judge finds actual partiality based upon the juror's *voir dire* answers." *Torres*, 128 F.3d at 43. Yet, there is no magic formula for identifying actual bias. Because the determination involves a factual finding of bias, the trial court's evaluation of the juror's answers, demeanor, and credibility are given considerable deference. *See, e.g.*, *id.* (citing *Wood*, 299 U.S. at 133). So even a juror who steadfastly assures the court that he can remain impartial can still be found to hold actual bias against the accused or for the government. And the Court's inquiry during a post-verdict hearing into bias does not have to elicit a dramatic admission of bias to grant the defendant's motion for a new trial.

Here, nothing about Juror 5's testimony during the post-verdict evidentiary hearing demonstrated his actual bias against Williams or in favor of the United States. Juror 5, of course, did not admit partiality. Instead, he credibly testified that he did not realize the connection between his foster family and SAUSA Parks until roughly a month after the trial ended, when he ran into

Larry Parks at the Beaver County fair. While Juror 5 testified that the name Parks rang a bell when he first heard SAUSA Parks introduce himself, he testified that he did not make much of it. Instead, Juror 5 testified that he spent the trial focused solely on the evidence.

Juror 5 also credibly testified that he never met or spoke to SAUSA Parks before the trial. And even if the Court credits Larry Parks's testimony that Juror 5 met SAUSA Parks when SAUSA Parks was only two (2) or three (3) years old—which would have been decades before Williams's trial—the outcome is the same. There is not even a significant enough relationship between Juror 5 and SAUSA Parks's parents to cause concern. After all, both Larry Parks and Juror 5 testified that they had not seen each other in years before running into one another at the fair—aside from the one passing encounter at the RV repair shop over a year before Williams's trial. In short, nothing about Juror 5's answers during the evidentiary hearing, or the evidence about his relationship to the Parks family, suggests that he could not serve as an impartial juror in Williams's case. To the contrary, Juror 5's credible answers convince the Court that he in fact did serve impartially, and the Williams has not advanced any evidence to the contrary. So Williams cannot show that Juror 5 held any actual bias against him or for the United States. And the Court's post-verdict evidentiary hearing ensured Williams received the due process promised by our Constitution.

### C. *McDonough* Claim

The standard for granting a new trial as a result of a juror's false statements or omissions during *voir dire* comes from *McDonough Power Equip., Inc. v. Greenwood*. Oddly enough for these purposes, that case involved a products liability claim where a defective lawnmower injured a child's feet. *McDonough*, 464 U.S. at 549. Yet the standard set out by the Supreme Court in *McDonough* equally applies to allegations of juror misconduct in criminal proceedings. *See United*

*States v. Claxton*, 766 F.3d 280, 301 (3d Cir. 2014). In *McDonough*, the Supreme Court laid out a two-part test for addressing juror lies and omissions. First, the party must "demonstrate that a juror failed to answer honestly a material question on *voir dire*." *McDonough*, 464 U.S. at 556. Second, that party must "further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* The Court observed that although "[t]he motives for concealing information may vary . . . only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

### i.     **McDonough** *Prong One*

In *McDonough*, the Supreme Court evidenced its unwillingness to "invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question." *Id.* at 555. That, the Court said, would "insist on something closer to perfection than our judicial system can be expected to give." *Id.* In several decisions applying *McDonough* in the criminal context, the Third Circuit took the opportunity to expound on the meaning of its first prong. In *United States v. Hodge*, our Court of Appeals held that honest, but mistaken, answers to *voir dire* questions will rarely provide a basis for granting a new trial. 321 F.3d 429, 441 (3d Cir. 2003) (quoting *McDonough*, 464 U.S. at 555). *Hodge* dealt with an allegation of an *intentional* omission by a juror, yet the opinion's upshot is that *McDonough*'s first prong requires some level of intent behind the juror's misstatement or omission. *See id.* And it is important to remember that *McDonough*'s first prong only applies to "material" *voir dire* questions, so a dishonest or withheld answer to a question that does not affect the juror's ability to act impartially cannot satisfy *McDonough*'s first prong. *See id.*; *see also Neder v. United States*, 527 U.S. 1, 16 (1999) (questions are material if they have "a natural tendency to influence, or [are] capable of influencing" the judge's determination whether a juror can be impartial.).

Potential jurors do not have an obligation to volunteer information not elicited through questioning during *voir dire*. *See, e.g.*, *Billings v. Polk*, 441 F.3d 238, 245 (4th Cir. 2006) (*McDonough* only provides relief "where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask"); *Fitzgerald v. Greene*, 150 F.3d 357, 363–64 (4th Cir. 1998) (denying *McDonough* claim because juror whose granddaughter had been molested answered that no family member had been "raped," attorney limited question to rape, and did not ask follow-up question about molestation).  But they no doubt have an obligation to answer honestly a question asked during *voir dire*. Most cases in which a court ordered a new trial under *McDonough* involve jurors who affirmatively lied during *voir dire*. But *McDonough*'s first prong is equally satisfied when a potential juror conceals information that he should have included in an answer to a *voir dire* question. So although honest but mistaken answers do not meet *McDonough*'s first prong, deliberate concealment does. *See, e.g.*, *Hodge*, 321 F.3d at 440–41; *United States v. Solorio*, 337 F.3d 580, 595–96 (6th Cir. 2003).

Here is the relevant portion of the Court's *voir dire*:

> I will ask the lawyers for the United States to please stand, first assistant U.S. attorney Ross Lenhardt, next is special assistant U.S. attorney Chad Parks.
>
>  I would note Mr. Lenhardt previously worked as an assistant district attorney in Allegheny County and Mr. Parks also serves as an assistant district attorney in Beaver County.
>
> Do any of you know or know anything about either of these individuals?
>
> . . .
>
> Have either of them ever been involved in any matter which you or a member of your immediate family has been involved in?

16

(ECF No. 297, at 2:10–24.)[**]

Juror 5 did not answer affirmatively to this question, because, as he explained during the evidentiary hearing, he had never seen or spoken to Chad Parks prior to jury selection in this case. During *voir dire*, Juror 5 did not know of his attenuated connection to SAUSA Parks, and therefore his answer to the *voir dire* question was neither dishonest nor deceptive. Juror 5 honestly thought he and his immediate family had no connection to SAUSA Parks, which is what the *voir dire* inquiry asked about. Thus, based on the testimony from Juror 5, as well as that of SAUSA Parks and Larry Parks, the Court concludes that Williams cannot meet *McDonough*'s first prong. This finding alone could end the Court's *McDonough* inquiry. Yet, for completeness, the Court will examine *McDonough*'s second prong.

### ii.    **McDonough *Prong Two***

As for *McDonough*'s second prong, the Supreme Court asked whether, knowing the information that the juror failed to disclose, would the trial court have granted a challenge for cause against the juror. Though a challenge for cause based on actual or implied bias may be one way to meet its second prong, *McDonough* does not impose a specific requirement that the Court find either form to grant a new trial. *See McDonough*, 464 U.S. at 556. As the foremost treatises on federal criminal practice and procedure identify, actual and implied bias may be the primary bases

---

[**] In the Opinion at ECF No. 294, the Court relied on its *voir dire* script, approved by all counsel, to quote the relevant question. (ECF No. 294, at 16.) After the Court issued its Opinion, for the reasons noted above, it directed that certain portions of the trial record be transcribed, including the precise *voir dire* exchange on this point. That transcription confirmed that the Court deviated slightly from that *voir dire* script during jury selection, specifically by also mentioning SAUSA Parks's work as a Beaver County ADA and AUSA Lenhardt's prior experience as an Allegheny County ADA, both references that were not included in the *voir dire* script and that more fully described the backgrounds of Messrs. Lenhardt and Parks. As such, the Court determined that for completeness, its Opinion should be amended to include the exact question that the Court read to the jury pool. The quote in this Opinion uses the relevant excerpt of the official transcript. (ECF No. 297.) In the Court's judgment, these additional identifiers of Messrs. Lenhardt and Parks, if anything, placed any connections between them and Allegheny and Beaver counties, respectively, more precisely before the jury panel, which did not lead to any response by Juror 5. Based on the Court's assessment of Juror 5's credibility and testimony at the evidentiary hearing in this case, the Court remains of the view that he testified truthfully that he did not make a connection with SAUSA Parks during the *voir dire* process.

for granting a challenge for cause, but they are not the only possible bases. 2 Charles Alan Wright et al., Federal Practice and Procedure § 382 (4th ed. updated Aug. 2019) (identifying statutory challenges for cause and challenges based on "inferred bias"); 6 Wayne R. LaFave et al., Criminal Procedure § 22.3(c) (4th ed. updated Dec. 2019). And the *McDonough* opinion itself can be fairly read to encompass the wide discretion that the trial judge has when deciding a challenge for cause. *See McDonough*, 464 U.S. at 556. What's more, the three (3) concurring Justices in *McDonough* believed that the new test they announced did not replace separate actual or implied bias challenges. *See id.* at 556 (Blackmun, J., concurring). All of this makes sense, because there would be little wisdom in preventing a defendant from obtaining a new trial when a juror was manifestly biased, but was also honest during *voir dire*, thus preventing that defendant from meeting *McDonough*'s first prong.

Though seemingly simple in its wording, there is substantial variation in how lower courts apply *McDonough*'s second prong. As for binding law this Court must apply, the Third Circuit's decision in *United States v. Mitchell* is highly informative. 690 F.3d 137. In *Mitchell*, our Court of Appeals stated that juror bias provides one ground to grant a for cause strike. *Id.* at 141–42. The Third Circuit then explained that "[t]raditionally, courts have distinguished between two types of challenges for cause: those based on actual bias, and those based on implied bias." *Id.* at 142. At times, courts in our Circuit have referenced a third type of bias: inferred bias. *See United States v. Holck*, 398 F. Supp. 2d 338, 362 (E.D. Pa. 2005) (citing *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002)). *Mitchell*'s discussion of bias, however, did not arise in the context of a *McDonough* motion, so it remains somewhat unclear exactly how *Mitchell*'s discussion of bias applies to *McDonough*'s second prong. *But see Claxton*, 766 F.3d at 301 (implying, but not directly holding, that courts should use *Mitchell*'s categorical approach during the *McDonough* prong two

analysis).

Some courts, such as the Sixth Circuit, generally follow the same categorical approach. *See English v. Berghuis*, 900 F.3d 804, 813 (6th Cir. 2018). In that Circuit, the answer to *McDonough*'s first prong is key to how the Court applies the second prong: "where the omission was unintentional, the petitioner must show 'actual bias,' but where the omission was intentional, bias may be inferred." *Id.* (citing *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995)). From that formulation of *McDonough*, any concealment during *voir dire* may meet the first prong, but the less sinister the concealment, the more serious the level of bias required to obtain a new trial.

Other courts follow a similar, but slightly different, track when applying *McDonough*'s second prong: asking whether the undisclosed information is evidence of bias that would lead a court to grant a challenge for cause, but not taking a categorical approach to examining bias. The First Circuit, in one of the most thorough opinions applying *McDonough*, took this non-categorical approach. *See Sampson v. United States*, 724 F.3d 150, 165 (1st Cir. 2013). In *Sampson*, a complex capital habeas case, the First Circuit noted that "[w]hat constitutes a valid basis for excusal within the purview of the binary [*McDonough* prong two] is the question that lies at the heart of these appeals." *Id.* There "[t]he district court took a categorical approach to this question, identifying three such bases: actual bias, implied bias, and inferable bias." But the First Circuit found "this categorical delineation unhelpful." *Id.* Rather than try to place facts in particular buckets of bias, the First Circuit noted that "the *McDonough* Court saw no need to use pigeonholes of this sort." *Id.* Rather, the *McDonough* Court "defin[ed] impartiality as a condition that allows a juror to be 'capable and willing to decide the case solely on the evidence.'" *Id.* (quoting *McDonough*, 464 U.S. at 554). So while the First Circuit's inquiry does not require labels, it still involves a detailed inquiry into the facts and circumstances surrounding the juror's alleged bias. *Id.*

19

Yet at least two (2) other circuits explicitly treat *McDonough* claims as distinct from actual or implied bias claims. In *Fields v. Brown*, the *en banc* Ninth Circuit identified three (3) forms of juror bias claims: "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on *voir dire*; actual bias, which stems from a pre-set disposition not to decide an issue impartially; and implied (or presumptive) bias, which may exist in exceptional circumstances" that impute bias as a matter of law. 503 F.3d 755 (9th Cir. 2007) (en banc) (footnote omitted). Under that tripartite approach, a "*McDonough* claim" focuses mainly on the bias that a court can infer from the juror's lie or deliberate omission. *See id.* at 773–75, 772 n.10. Yet despite treating the different forms of bias as distinct claims, when the juror failed to disclose the relevant information during *voir dire*, the Ninth Circuit instructed that trial courts should answer the bias inquiry for all three (3) varieties based on what it knows following the post-verdict evidentiary hearing. *Id.* at 774–75. Along the same lines, the Fourth Circuit distinguishes between actual bias claims and *McDonough* claims. *See Porter v. Zook*, 898 F.3d 408, 420–32 (4th Cir. 2018); *Jones v. Cooper*, 311 F.3d 306, 310–313 (4th Cir. 2002). Such a distinction means that even if the juror's failure to disclose information during *voir dire* stemmed from an honest mistake, the defendant still deserves a new trial if a post-verdict evidentiary hearing uncovers actual bias against the defendant or for the government. *See Porter*, 898 F.3d at 421–22.

The Ninth and Fourth Circuits' distinction between actual bias and implied bias claims on one hand, and *McDonough* claims on the other, creates at least some confusion when applying *McDonough*'s second prong. After all, *McDonough*'s second prong asks whether the undisclosed information would have provided a ground to strike the juror for cause, and the quintessential challenge for cause is a biased juror. But if implied and actual bias—the categories of bias most often referenced in the case law—are distinct claims, then one or the other of *McDonough*'s prongs

seem superfluous. There is presumably total overlap between asking whether the juror had actual bias and asking whether defendant could have challenged that same juror for cause, even if the latter is broader than the former. That would render *McDonough*'s second prong automatically met when the defendant meets the actual bias test. In the same vein, if actual bias is by itself grounds for a new trial, then *McDonough*'s first prong does not do any work, because the juror's honesty does not factor into a reviewing court's decision.

The simplest way to smooth the edges of somewhat conflicting case law in this arena is to recall the basic principle behind *McDonough*: the information at issue must have not come to light during *voir dire*, even though it should have. *McDonough*, then, is about ensuring that the *voir dire* process is not short circuited by a juror who fails to honestly answer the questions asked. Actual bias and implied bias claims, on the other hand, serve a different purpose, at least at the start—ensuring that the jury is impartial. Those latter two forms of bias arise whether the information that suggests bias comes out during *voir dire* or some later time. So a defendant may be able to raise an actual or implied bias claim even when he cannot raise a *McDonough* claim. This might explain why there is some overlap between the different claims, but also why courts have seen fit not to merge actual bias and implied bias claims entirely into *McDonough*'s second prong. *See McDonough*, 464 U.S. at 556 (Blackmun, J., concurring) (noting that the *McDonough* did not replace actual and implied bias claims). For these reasons, the clearest way to understand *McDonough* is to read its second prong as encompassing some aspects of the actual and implied bias inquiries, but not requiring either to grant relief. Instead, *McDonough* allows the Court to grant a new trial if it would have granted a "for cause" challenge had it known the information. That is an intangible determination that does not mandate slapping the label of actual or implied bias on the juror's answers.

The Third Circuit does not have a large body of case law interpreting *McDonough*'s second prong. In many cases, our Court of Appeals easily concluded that the petitioner failed to meet *McDonough*'s first prong, and therefore did not interpret the second. *See, e.g.*, *Hodge*, 321 F.3d at 440–41. What's more, even though *Mitchell* did not involve a *McDonough* challenge—because there the relevant bias information came out during *voir dire*—the Court still undertook an implied bias inquiry. *Mitchell*, therefore, shows that the Third Circuit recognizes distinct actual bias and implied bias claims—claims that do not depend on the Court finding that the juror lied or deliberately concealed information as a prerequisite to granting a new trial. Yet at the same time, when the Third Circuit discussed *McDonough*'s second prong in *Claxton*, it asked whether the undisclosed information evidenced actual or implied juror bias. *See Claxton*, 766 F.3d at 301.

In summary, the logical conclusion when the Court reads the Third Circuit's decision in *Mitchell* and the Supreme Court's decision in *McDonough* is that when the Court applies *McDonough*'s second prong, it should inquire into not only Juror 5's actual or implied bias, but also whether any of the information "concealed" would have led the Court to strike the juror for cause for any reason. In the end, however, *McDonough* does not provide the only means for the defendant to obtain a new trial. *See, e.g.*, *United States v. Console*, 13 F.3d 641, 666 (3d Cir. 1993) (citing *Smith*, 455 U.S. at 220) (addressing a stand-alone actual bias test for obtaining a new trial). The bottom line being that the Court should undertake separate inquires for implied and actual bias, both of which provide an independent basis for granting a new trial, as well as conduct the full *McDonough* two-step inquiry—even though some aspects of the three (3) inquiries will overlap.

Here, there is simply no basis for the Court to, in retrospect so to speak,  grant a for cause strike based on the late-breaking news that Juror 5's foster mother was SAUSA Parks's great-

grandmother's niece. To the extent that *McDonough*'s second prong overlaps with the actual and implied bias claims, the Court's analysis for those claims applies with equal force here. Nothing about Juror 5's attenuated connection to SAUSA Parks would require the Court to imply bias as a matter of law—the relationship is far too attenuated for such a finding. And nothing about Juror 5's answers during the evidentiary hearing led the Court to believe that he was not an impartial juror. Since actual and implied bias are the most common reasons for a for cause strike, the absence of both here severely limits Williams's ability to prove *McDonough*'s second prong.

Separate from actual and implied bias, courts may be required to grant for cause strikes based on a statute deeming the potential juror unfit or because of inferred bias from the juror's *voir dire* answers. Here, Williams has not pointed to a statute that would have required Juror 5's disqualification and the Court knows of no such statute. And because the Court finds that Juror 5 answered the *voir dire* questions honestly, there is no deception from which the Court could infer bias. *Cf. English*, 900 F.3d at 813. Simply put, the Court would not have granted a for cause challenge based solely on Juror 5's highly attenuated connection to SAUSA Parks. Had that come out in the voir dire process, that, with nothing more, would not have led to the Court striking Juror 5 on its own, or counsel's, motion for cause. Absent some indication that Juror 5 was unable or unwilling to deliberate and render a verdict based only on the evidence admitted at trial and the instructions of the Court, in the Court's estimation, there would not have been a basis to grant a "strike for cause" motion, particularly when there would be no support for an actual or implied bias challenge. And here, there was nothing adduced at the evidentiary hearings, or advanced by Williams, that would indicate that Juror 5 was unable or unwilling to do his sworn duty to decide the case based solely on the evidence presented and the instructions from the Court. Just as Williams could not satisfy *McDonough*'s first prong, he cannot establish its second.

In the end, Williams cannot establish actual bias, implied bias, or his *McDonough* claim. The Court, based in large part on the testimony presented during the post-verdict evidentiary hearing, is confident that Williams received a trial before a fair and impartial jury. For these reasons, Williams's Motion for a New Trial (ECF No. 259), is denied.

### III.    MOTION FOR JUDGMENT OF ACQUITTAL (ECF NO. 247)

After the guilty verdict, Williams timely moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. (ECF No. 247.) Rule 29(c)(2) provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). But the Court must uphold the verdict "unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 183 (3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)). In other words, the Court must sustain a verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. *See, e.g.*, *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003). This requires the Court to "examine the totality of the evidence, both direct and circumstantial," and "credit all available inferences in favor of the government." *Id.* Yet, the Court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

Here, the United States presented sufficient evidence, and then some, to uphold the jury's conviction on all counts alleged in the Superseding Indictment. Count I charged Williams with possession with intent to distribute 100 grams or more of heroin under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(i). That statute requires the United States to prove: (1) Williams possessed the heroin; (2) that his possession was done knowingly; (3) that he intended to distribute the heroin; and (4)

the attributable weight of the mixture or substance containing heroin was 100 grams or more.

At trial, several law enforcement witnesses testified that they, literally, tackled Williams as Williams carried a bag containing 15,000 heroin stamp bags to what Williams thought was a meeting with a buyer.[***] Those stamp bags contained well over 100 grams of a mixture or substance containing heroin. There was also ample evidence from DEA special agents and task force officers establishing Williams's constructive possession of 126 grams of black tar heroin at the Boost Mobile store Williams operated. For both the stamp bags and black tar heroin, the sheer volume is strong evidence that Williams intended to distribute the heroin. So, suffice it to say, there is more than sufficient evidence to support Williams's conviction at Count I.

Count II charged Williams with conspiracy to distribute and possess with intent to distribute 100 grams of more of heroin under 21 U.S.C. § 846. Under that statute, the United States must prove: (1) two or more people agreed to distribute or possess with intent to distribute heroin; (2) heroin is a Schedule I drug; (3) Williams was a party to the agreement; (4) Williams and at least one other conspirator shared a unity of purpose and intent to achieve that purpose; and (5) the heroin attributable to Williams through his own conduct and the reasonably foreseeable conduct of another conspirator totaled 100 grams or more.

As the Court explained with respect to Count I, DEA special agents arrested Williams while he carried 15,000 stamp bags to a staged drug deal. Because Williams physically possessed more than 100 grams of a mixture and substance containing heroin, the United States easily proved the weight element. And the United States provided testimony from a cooperating witness who played

---

[***] The Opinion at ECF No. 294 stated at DEA Agent Cielecy tackled Williams. The United States, in what the Court considers to be an informal request that the Court consider an amendment for purposes of precision, pointed out that other law enforcement agents and task force officers tackled Williams, not Agent Cielecy.

an undercover recording of Williams agreeing to sell the cooperating witness 300 bricks of heroin.[3] So the United States established the existence of an agreement, with Williams as a party, and a unity of purpose and intent to achieve the objective of the agreement. Thus, there was plenty of evidence for the jury to convict Williams on Count II.

On Count III, the United States charged Williams unlawful possession of a firearm under 18 U.S.C. § 922(g)(1). To convict Williams under this statute, the United States needed to prove: (1) Williams had been previously convicted of a felony—i.e., a crime punishable by a term of imprisonment of more than one year; (2) Williams knew his prior conviction was for a felony; (3) he knowingly possessed a firearm or ammunition; and (4) his possession of the firearm or ammunition was in or affecting interstate commerce.

Williams and the United States stipulated to his past felony conviction, knowledge of that conviction, and the interstate commerce element. As for the possession element, the United States presented evidence that Williams knowingly possessed several firearms. The United States presented evidence that DEA special agents and task force officers recovered four (4) firearms from Williams's Boost Mobile store, which the evidence showed Williams knowingly constructively possessed. And the United States presented evidence that law enforcement recovered a loaded 9mm handgun from the truck Williams drove to the staged drug deal. So, taken in the light most favorable to the United States, the evidence presented to the jury was sufficient to support Williams's conviction on Count III.

Finally, on Count IV the United States charged Williams with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Under that statute, the United States must prove: (1) Williams committed the drug trafficking crime alleged

---

[3] A brick of heroin is fifty (50) stamp bags, so 300 bricks is 15,000 stamp bags—i.e., the amount of heroin brought to what Williams thought was going to be the exchange of cash-for-heroin with the cooperating witness.

in either, or both, Count I or Count II; and (2) Williams possessed a firearm in furtherance of the drug trafficking crime for which he was convicted.

Here, the jury convicted Williams for the drug trafficking crimes alleged in both Count I and II. And the evidence presented at trial supports the jury's finding that Williams knowingly possessed the firearms in furtherance of those drug trafficking crimes. For instance, Williams brought the loaded 9mm with him to the drug transaction. What's more, the firearms located in Williams's Boost Mobile store included a stolen handgun, a different handgun with an obliterated serial number, and two (2) stolen military-style rifles. It is a reasonable inference from the fact that one (1) gun was stolen, one (1) gun had its serial number obliterated, and two (2) firearms were military-style rifles, along with the location of the guns,  that Williams possessed those firearms to further his drug trafficking crimes. Therefore, the United States presented sufficient evidence to support Williams's conviction on Count IV.

In short, the United States presented more than sufficient evidence to support the jury's verdict on all counts. Williams's Motion for Judgement of Acquittal (ECF No. 247), therefore, is denied.

## IV.    <u>CONCLUSION</u>

Williams asks the Court to grant him a new trial because one (1) of the jurors who convicted him has an attenuated connection to one (1) of his prosecutors. The Court ordered a post-verdict evidentiary hearing and took testimony from the juror at issue—whose only connection to the prosecutor, who he had never met before the trial, was that the prosecutor's great-grandmother's niece served as the juror's foster parent for many years, many years ago—as well as from the prosecutor and prosecutor's father. Based on that testimony, the Court concludes that Williams received a trial with jury that was fair in appearance and fact. His motion for a new trial (ECF No.

259) is, therefore, **DENIED**. And because there was more than sufficient evidence presented during Williams's trial to support his conviction on all counts alleged against him in the Superseding Indictment, Williams's Motion for a Judgment of Acquittal (ECF No. 247), is **DENIED**.

/s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: April 15, 2020
cc:      All counsel of record